AMY J. LONGO (Cal. Bar No. 198304)
Email: longoa@sec.gov
LYNN M. DEAN (Cal. Bar No. (Cal. Bar No. 205562)
Email: deanl@sec.gov
CHRISTOPHER A. NOWLIN (Cal. Bar No. 268030)
Email: nowlinc@sec.gov

Attorneys for Plaintiff
Securities and Exchange Commission
Michele Wein Layne, Regional Director
Alka N. Patel, Associate Regional Director
Amy J. Longo, Regional Trial Counsel
444 S. Flower Street, Suite 900
Los Angeles, California 90071
Telephone: (323) 965-3998
Facsimile: (213) 443-1904

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>Plaintiff,<br><br>vs.<br><br>DIRECT LENDING INVESTMENTS, LLC,<br><br>Defendant. | Case No. 2:19-cv-2188<br><br>**COMPLAINT** |

Plaintiff Securities and Exchange Commission ("SEC") alleges:

## JURISDICTION AND VENUE

1. The Court has jurisdiction over this action pursuant to Sections 20(b), 20(d)(1) and 22(a) of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. §§ 77t(b), 77t(d)(1) & 77v(a), and Sections 21(d)(1), 21(d)(3)(A), 21(e) and 27(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78u(d)(1), 78u(d)(3)(A), 78u(e) & 78aa(a), and Sections 209(d), 209(e)(1) and 214 of the

1 | Investment Advisers Act of 1940 ("Advisers Act"), 15 U.S.C. §§ 80b-9(d), 80b-9(e)(1) & 90b-14.

2. Defendant has, directly or indirectly, made use of the means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange in connection with the transactions, acts, practices and courses of business alleged in this complaint.

3. Venue is proper in this district pursuant to Section 22(a) of the Securities Act, 15 U.S.C. § 77v(a), Section 27(a) of the Exchange Act, 15 U.S.C. § 78aa(a), and Section 214 of the Advisers Act, 15 U.S.C. § 80b-14, because certain of the transactions, acts, practices and courses of conduct constituting violations of the federal securities laws occurred within this district. In addition, venue is proper in this district because Defendant has its principal place of business in this district.

## SUMMARY

4. This matter concerns a multi-year fraud perpetrated by Defendant Direct Lending Investments, LLC ("DLI"), a registered investment adviser, through its then-principal, Brendan Ross ("Ross"), which resulted in approximately $11 million in over-charges of management and performance fees to fund investors, and the inflation of DLI's private funds' returns.

5. DLI advises a private fund structure that invests in various lending platforms, including QuarterSpot, Inc. ("QuarterSpot"), an online small business lender. Management at DLI recently discovered that for years, Ross, DLI's 100% owner and then-chief executive officer, arranged with QuarterSpot to falsify borrower payment information for QuarterSpot's loans and to falsely report to DLI that borrowers made hundreds of monthly payments when, in fact, they had not.

6. According to a senior executive representative of DLI, many of these loans should have been valued at zero, but instead were valued at par, because of the false payments Ross helped engineer. The effect of this was that, between 2014 and 2017, DLI cumulatively overstated the valuation of its QuarterSpot position by

approximately $53 million and misrepresented the Funds' performance by approximately two to three percent annually. As a result, DLI collected roughly $11 million in excess management and performance fees from the Funds that it would not have otherwise collected, had the QuarterSpot position been accurately valued.

7. By engaging in this conduct, DLI violated Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5 promulgated thereunder, Section 17(a) of the Securities Act of 1933 ("Securities Act"), and Sections 206(1), 206(2), and 207 of the Investment Advisers Act of 1940 ("Advisers Act").

8. The SEC seeks a preliminary injunction and appointment of a permanent receiver; permanent injunctions; disgorgement with prejudgment interest, and civil penalties.

## THE DEFENDANT

9. **Defendant Direct Lending Investments, LLC** is an SEC registered investment adviser with its principal place of business in Glendale, California. It advises a private fund structure comprised of two "feeder" funds (Direct Lending Income Fund, L.P. and Direct Lending Income Feeder Fund, Ltd.) and a "master" fund (DLI Capital, Inc.) (collectively, the "Funds") and is solely responsible for the Funds' management. According to its latest SEC Form ADV Part 1A filing on February 25, 2019, DLI had approximately $866,300,000 in assets under management as of May 31, 2018.

## OTHER PERSONS AND ENTITIES

10. **Brendan Ross** is the 100% owner and was until recently the chief executive officer of DLI.

11. **QuarterSpot, Inc.** is a private company located in New York that provides online lending services to small businesses and retailers.

## THE ALLEGATIONS

A. **DLI's Business**

12. DLI was founded by Ross in 2012, and he was its CEO until his

COMPLAINT 3

resignation on March 18, 2019.

13. Its primary investment focus is on buying loans, participating in loans, and owning credit facilities and other structures where loans and other assets serve as collateral.

14. DLI has at times described its "typical investments" as consisting of "$50-200 million asset-backed credit facilities to a diverse group of specialty finance companies, special purpose vehicles and other counterparties . . . across the small business, consumer, receivables, real estate and other sectors."

15. DLI charges clients both a management fee and a performance fee on the Funds' assets. The management fee is calculated as 1% of the master fund's gross asset value plus beginning of month subscriptions less redemptions. The performance fee is incurred when the master fund's net asset value exceeds its prior high net asset value and is calculated as 20% of these earnings before interest and taxes.

16. DLI has regularly communicated with Fund investors through monthly investor letters signed by Ross and an investor portal.

17. The monthly letters have typically included statements regarding the amount of DLI's assets under management and returns on investment broken out by month.

18. The investor portal has at times provided investors with access to detailed information on DLI's asset portfolio and its specific counterparties, including the valuation of its various counterparty positions by unpaid principal balance and the profits and losses information (including gross income and changes in loss reserves data) for those counterparty positions over different periods of time.

19. DLI's assets under management are reported in the Forms ADV that DLI files with the SEC.

20. In its marketing materials, DLI has touted its strong, consistent returns to its investors. For example, DLI "fact sheets" marketed its 10-12% returns, no lock-

up, and monthly (35-day) liquidity.

21. In multiple written communications with potential and actual investors spanning at least October 2015 to June 2016, Ross highlighted the Funds' "10-12% returns net to investors with no down months," as well as the fact that defaults could be as high as 20% without any loss of principal to investors.

**B.  DLI's Relationship with QuarterSpot**

22. QuarterSpot is one of DLI's longest standing Fund investments, and its principals are close business associates of Ross.

23. On its website, QuarterSpot advertises its "lower rates without personal guarantees or credit checks" and its ability to provide working capital in as little as 24 hours.

24. In August 2013, DLI entered into an agreement with QuarterSpot where it agreed to purchase "unsecured payment dependent promissory notes ('Spots') from QuarterSpot."

25. Under the terms of this arrangement, QuarterSpot would continue to service the loans and keep a service fee, or "investor fee," that was later memorialized in several internal and audit-related documents at 17.5% of interest collected.

26. Between August 2013 and June 2017, DLI's QuarterSpot position (loan principal plus cash value) increased significantly from $427,333 to $149,608,733.

27. In late September 2017, DLI entered into a transaction to sell approximately $55 million of the QuarterSpot assets at par to DL Global Ltd. ("DL Global"), an investment vehicle run by one of Ross's business associates, with foreign investors.

28. Ross personally guaranteed the performance of the QuarterSpot assets sold in the transaction, and further pledged his equity interest in DLI as collateral for the guarantee. The transaction resulted in DLI's position in QuarterSpot (loan principal plus cash value) dropping from $139,756,336 to $71,506,605 between

COMPLAINT                                      5

August and September 2017.

29. DLI remained involved in processing the loan information for the QuarterSpot loans after those loans were sold to DL Global.

30. As part of DLI's monthly reporting and closing process, QuarterSpot is required to provide DLI with loan-level data, including performance figures for each loan.

31. DLI used this loan-level information to determine how the QuarterSpot loans are performing, and to create a monthly closing report and valuation for the QuarterSpot position.

32. The monthly fair values of QuarterSpot and each of the Funds' other investments are used to determine the aggregate fair value of the Funds' portfolio and in turn, the master fund's value.

33. Monthly management fees are calculated based on the gross asset value of the master fund.

34. The net asset value of the master fund serves as the basis for calculating that month's performance fees and the monthly returns reported to current and prospective investors.

35. According to a senior DLI representative, for DLI's QuarterSpot position, every single dollar paid (or not paid) on a given loan impacts DLI's financials.

**C.   Ross's Scheme to Manipulate QuarterSpot's Payment Data**

36. Between 2014 and at least February 2018, Ross knew of problems with the quality of DLI's QuarterSpot loan portfolio and actively took steps to conceal these issues.

37. Email communications between Ross and QuarterSpot's principals between 2014 to early 2018, frequently from his personal email account and always without copying anyone else from DLI, show that Ross encouraged QuarterSpot to manipulate the loan-level information that it reported to DLI, including both directing

COMPLAINT                                6

QuarterSpot to delay recognizing delinquent loans, and falsifying borrower payment information to make it appear as though payments had been made by borrowers, when they had not.

38. More specifically, Ross regularly emailed QuarterSpot principals at the beginning of each month spreadsheets that appear to contain falsified payment figures that Ross was directing QuarterSpot to apply to certain non-performing loans.

39. For example, on March 8, 2014, Ross sent QuarterSpot's principals an email titled "Late Loans.," where he noted "a very substantial number of Late loans that are not written off", describing the problem as "scary" and saying "I need to understand how we get out of the woods that we're in right now, where you are using up equity to make up for the underwriting, which is scary as hell for both of us."

40. On January 18, 2015, Ross emailed QuarterSpot's principals spreadsheets titled "Payments 12-31-2014" and "LateLoans," that appear to direct QuarterSpot to add borrower payments for 42 loans that totaled $13,734 before sending the information to others at DLI.

41. On February 8, 2015, Ross emailed QuarterSpot's principals, expressing concern that "more loans are going late each month than I can afford and still have normal returns, so that the can we are kicking down the road is growing in size," and asking QuarterSpot to send "a version of the Late Loans report that has their true, non-quarterspot Last Posted date."

42. On February 3, 2016, Ross emailed QuarterSpot that "quite a few of these loans have Payment amounts of 50, 100, or 200," noting that "they will stick out and should be reverted back to their normal payment amount for these late loans."

43. On August 7, 2017, QuarterSpot informed Ross, using his personal rather than his DLI email address, that it planned to add values for borrowers who did not make payments; Ross responded, "Do you want to permanently edit the 'Payment' field for those borrowers, inserting $150 or something like that? Seems like there should be a value in the database for them."

COMPLAINT                                    7

44. The spreadsheets that Ross regularly sent to QuarterSpot at the beginning of each month often had "BR" or "BRpays" in their titles and included falsified monthly payment figures that in some cases included hundreds of loans in a given month.

45. The total value of the falsified payment figures in a given month ranged from just under $20,000 to just under $100,000.

46. In many of these emails, Ross directed QuarterSpot to apply the fictitious payment figures and to then send on the information to DLI's finance team.

47. According to a company representative, up until at least February 2018, the falsified borrower payments that Ross directed QuarterSpot to make were included in what QuarterSpot reported to DLI on a monthly basis.

48. A recent analysis by DLI also showed that the money that was falsely labeled borrower payments likely came from QuarterSpot rebating its servicing fees, meaning that QuarterSpot did not take portions of its fees during certain months and that these amounts were paid or credited to DLI but disguised as loan borrower payments to give the false impression that the underlying loans were performing.

49. Any reasonable investor would have believed it important to know that Ross was manipulating and falsifying data necessary to value the Funds' position in QuarterSpot and DLI's management fees.

50. Ross acted knowingly, recklessly, and negligently in deceiving DLI, the Funds, Fund investors, and others at DLI, concerning the QuarterSpot loan quality and performance, and failed to exercise reasonable care to ensure that Fund investors were not deceived as to this information.

**D. Material Misstatements of DLI's Funds' Fees and Performance**

51. According to a representative of DLI, Ross's falsification of borrower payment information led DLI to value many of the nonperforming QuarterSpot loans at par when the values should have been reduced to zero.

52. Even though DLI still received money from QuarterSpot in the form of

rebated fees, the false payment data undermined DLI's ability to assess the credit of the underlying loans, which should have been considered defaulted.

53. This caused the QuarterSpot position to be overvalued and the Funds' net asset value to be inflated.

54. According to a DLI representative, the falsified QuarterSpot borrower payment information led DLI to materially overstate the valuation of its QuarterSpot position by an approximate cumulative amount of $53 million between 2014 and 2017.

55. According to a DLI representative, the incorrect valuation of the QuarterSpot position resulted in DLI overstating the Funds' heavily marketed returns by an approximate 2-3% on an annual basis between 2014 and 2017, with the most significant effect felt earlier in time when the QuarterSpot position was a larger percentage of the DLI portfolio.

56. According to a company representative, the false valuation and performance figures for the QuarterSpot position resulted in DLI collecting roughly $11 million in excess management and performance fees through 2017.

57. According to a DLI representative, Ross's manipulation of borrower payment data for loans held by the Funds likely continued up until at least February 2018.

58. Any reasonable investor would have wanted to know that DLI was overcharging management and performance fees and that the Funds' returns were overstated.

59. Ross acted knowingly, recklessly, and negligently in materially misstating the Funds' valuation, performance, and fees, and failed to exercise reasonable care to ensure that Fund investors received the Funds' true valuation, performance and fees.

**E. Ross's Recent Resignation from DLI**

60. In October 2018, a debt collector for DLI's QuarterSpot loan portfolio

COMPLAINT 9

informed a representative of DLI that certain borrower payment data on DLI's books did not match data the collector had received directly from QuarterSpot.

61. When that DLI representative confronted QuarterSpot, QuarterSpot's representatives indicated it was "an IT issue" and that QuarterSpot would work it out.

62. In December 2018, a DLI employee responsible for debt collection spoke to a QuarterSpot representative, who said the borrowers identified as having made small payments had not actually made the payments.

63. When next asked about this issue in or about January 2019, the QuarterSpot representatives refused to answer and directed the DLI representative to Ross, who denied knowledge of the false payments.

64. On February 11, 2019, DLI announced to Fund investors that the Funds had suspended withdrawals and redemptions because one of DLI's largest counterparties, VOIP Guardian Partners I, LLC ("VOIP Guardian"), had ceased making payments on a $192 million loan. DLI indicated in its announcement that it suspected that the cessation of payments was likely a result of undetermined misconduct and that a substantial portion of the outstanding $160 million loan balance may not be recoverable.

65. On March 19, 2019, DLI announced to Fund investors that another of the Funds' positions, QuarterSpot, may have been materially overstated for a period of years, and that, following the request of DLI's management committee that he take a leave of absence, Ross had formally resigned all positions at DLI on March 18, 2019 and had ceded control to its management committee.

**F. Defendant DLI is an Investment Adviser**

66. Defendant DLI is an investment adviser registered with the SEC.

67. It acted as an investment adviser to the Funds because it advised the Funds about investing in securities and received compensation in the form of a percentage of assets managed and a performance fee.

68. As an investment adviser, DLI owed the Funds a fiduciary duty and was

prohibited from making untrue statements of material fact or from omitting to state material facts necessary to make its statements not misleading. Through Ross's conduct, which is imputed to DLI because he was chief executive officer and 100% owner, DLI violated these obligations, by the acts alleged in this Complaint.

### G. The Limited Partnership Interests in the Funds Are Securities

69. Investor funds were pooled in the Funds to finance various ventures that DLI would choose to invest in.

70. The investors in the Funds were dependent on the success of the underlying businesses to generate their return, while DLI was also dependent on the success of the businesses because the DLI management and performance fees were directly tied to how the positions grew and performed, respectively.

71. The efforts of DLI and Ross in allocating capital and managing the Funds' investments were critical to the enterprise's success, as there is no indication that investors in the Funds played an active role in managing DLI's investment decisions.

## FIRST CLAIM FOR RELIEF
### Fraud by an Investment Adviser
### Violations of Sections 206(1) and 206(2) of the Advisers Act
### (against Defendant DLI)

72. The SEC realleges and incorporates by reference paragraphs 1 through 71 above.

73. DLI breached its fiduciary duties when it defrauded its clients, the Funds, by fabricating borrower payment figures and otherwise manipulating information concerning the value of the underlying loans, which caused the Funds to pay materially inflated management and performance fees. The effect of this was to make the QuarterSpot loans look stronger than they were, which made DLI's QuarterSpot investment appear sounder, which inflated the Funds' assets, valuation, and performance numbers. Information concerning the viability and profitability of

the QuarterSpot investment, which for many years exceeded $100 million in DLI's portfolio, was certainly material to the Funds' valuation and performance data, as confirmed by a representative of DLI.

74. The false information regarding the QuarterSpot loans also materially impacted the management and performance fees that DLI charged the Funds. As a result of this manipulation concerning the value of DLI's QuarterSpot position, the Funds were charged roughly $11 million in excess management and performance fees between 2014 and 2017.

75. Ross, whose scienter and negligence can be imputed to DLI, was fully aware of the underlying manipulation of loan-level data and appears to have directed that process, seemingly for the very purpose of mismarking the Funds' assets and inflating their performance numbers.

76. By engaging in the conduct described above, Defendant DLI, directly or indirectly, by use of the mails or means and instrumentalities of interstate commerce, knowingly, recklessly or negligently: (a) employed or is employing devices, schemes or artifices to defraud clients or prospective clients; and (b) engaged in or is engaging in transactions, practices, or courses of business which operated as a fraud or deceit upon clients or prospective clients.

77. By engaging in the conduct described above, Defendant DLI has violated, and unless restrained and enjoined, is reasonably likely to continue to violate, Sections 206(1) and (2) of the Advisers Act, 15 U.S.C. §§ 80b-6(1) & 80b-6(2).

## SECOND CLAIM FOR RELIEF

**Fraud in the Connection with the Purchase and Sale of Securities**

**Violations of Section 10(b) of the Exchange Act and Rule 10b-5**

**(against Defendant DLI)**

78. The SEC realleges and incorporates by reference paragraphs 1 through 71 above.

79. DLI made false and misleading statements and engaged in deceptive conduct towards the investors in its Funds. Through its investor letters and investor portal, DLI provided the Funds' investors with information concerning its assets under management, the valuation of different positions within its portfolio, and the performance of its different loan platforms, including QuarterSpot. The information that DLI provided to investors regarding QuarterSpot was false and misleading because it was based on fabricated underlying loan level data that concealed the true delinquency levels for the QuarterSpot loan portfolio, thereby masking the true performance and valuation of DLI's QuarterSpot position. This in turn caused DLI to make false and misleading statement to the Funds' investors about the management and performance fees that the Funds owed.

80. The misrepresentations made by DLI were material because investors in the Funds would have considered it important to their investment decisions to have accurate information concerning the financial stability of the underlying platforms in which the Funds were investing their money, as that could directly impact their ability to receive back their principal investments and achieve the high returns that DLI advertised. The misrepresentations were also material because they directly impacted the management and performance fees that DLI charged the Funds, thereby diminishing the returns flowing to the investors.

81. DLI knew, or was reckless in not knowing, that its statements regarding its QuarterSpot position, including the valuation and performance of that position, were false or misleading because it was Ross himself who manipulated the underlying borrower payment information, creating a situation where the QuarterSpot position could not be properly valued or its performance assessed. Ross's use of his personal email account to communicate with QuarterSpot about adjusting the borrower payment information is further evidence of his efforts to conceal his conduct and his fraudulent intent. Ross's scienter can be imputed to DLI.

82. Ross, DLI's principal, knowingly engaged in a multi-year scheme to

mask the poor performance of one of the Funds' largest investments, QuarterSpot. The principal purpose and effect of this was to allow the Funds to delay recognizing losses on the QuarterSpot position, which could have threatened DLI's ability to attract or maintain investors and eroded its ability to cite the strong performance of the Funds. Ross committed acts in furtherance of the scheme by routinely falsifying borrower payment entries for QuarterSpot's loans. This scheme had a material effect on the information that DLI provided to the investors in the Funds.

83. By engaging in the conduct described above, Defendant DLI, directly or indirectly, in connection with the purchase or sale of a security, by the use of means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange: (a) employed devices, schemes, or artifices to defraud; (b) made untrue statements of a material fact or omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (c) engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons.

84. Defendant DLI, with scienter, employed devices, schemes and artifices to defraud; made untrue statements of a material fact or omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and engaged in acts, practices or courses of conduct that operated as a fraud on the investing public by the conduct described in detail above.

85. By engaging in the conduct described above, Defendant DLI violated, and unless restrained and enjoined will continue to violate, Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rules 10b-5(a), 10b-5(b), and 10b-5(c) thereunder, 17 C.F.R. §§ 240.10b-5(a), 240.10b-5(b) & 240.10b-5(c).

### THIRD CLAIM FOR RELIEF

**Fraud in the Offer or Sale of Securities**

**Violations of Section 17(a) of the Securities Act**

**(against Defendant DLI)**

86. The SEC realleges and incorporates by reference paragraphs 1 through 71 above.

87. DLI engaged in deceptive conduct and obtained money by means false and misleading statements to the investors in its Funds. Through its investor letters and investor portal, DLI provided the Funds' investors with information concerning its assets under management, the valuation of different positions within its portfolio, and the performance of its different loan platforms, including QuarterSpot. The information that DLI provided to investors regarding QuarterSpot was false and misleading because it was based on fabricated underlying loan level data that concealed the true delinquency levels for the QuarterSpot loan portfolio, thereby masking the true performance and valuation of DLI's QuarterSpot position. This in turn caused DLI to make false and misleading statement to the Funds' investors about the management and performance fees that the Funds owed.

88. The misrepresentations made by DLI were material because investors in the Funds would have considered it important to their investment decisions to have accurate information concerning the financial stability of the underlying platforms in which the Funds were investing their money, as that could directly impact their ability to receive back their principal investments and achieve the high returns that DLI advertised. The misrepresentations were also material because they directly impacted the management and performance fees that DLI charged the Funds, thereby diminishing the returns flowing to the investors.

89. DLI's statements regarding its Funds' performance and assets under management were pillars of its marketing strategy that brought investors to the Funds. By inflating those key metrics through manipulation of the QuarterSpot loan

figures, DLI was able to recruit and maintain investors in the Funds on whose assets it could charge management and performance fees, thereby obtaining money by means of the misrepresentations.

90. DLI knew, or at a minimum was negligent in not knowing, that its statements regarding its QuarterSpot position, including the valuation and performance of that position, were false or misleading because it was Ross himself who manipulated the underlying borrower payment information, creating a situation where the QuarterSpot position could not be properly valued or its performance assessed. Ross's use of his personal email account to communicate with QuarterSpot about adjusting the borrower payment information is further evidence of his efforts to conceal his conduct and his fraudulent intent. Ross's scienter and negligence can be imputed to DLI.

91. By engaging in the conduct described above, Defendant DLI, directly or indirectly, in the offer or sale of securities, and by the use of means or instruments of transportation or communication in interstate commerce or by use of the mails directly or indirectly: (a) employed devices, schemes, or artifices to defraud; (b) obtained money or property by means of untrue statements of a material fact or by omitting to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchaser.

92. Defendant DLI with scienter, employed devices, schemes and artifices to defraud; with scienter or negligence, obtained money or property by means of untrue statements of a material fact or by omitting to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and, with scienter or negligence, engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchaser.

93. By engaging in the conduct described above, Defendant DLI violated, and unless restrained and enjoined will continue to violate, Sections 17(a)(1), 17(a)(2), and 17(a)(3) of the Securities Act, 15 U.S.C. §§ 77q(a)(1), 77q(a)(2), & 77q(a)(3).

## FOURTH CLAIM FOR RELIEF

### False Forms ADV

### Violations of Section 207 and of the Advisers Act

### (against Defendant DLI)

94. The SEC realleges and incorporates by reference paragraphs 1 through 71 above.

95. DLI violated Section 207 by filing multiple annual amendments to its Forms ADV between 2014 and March 2018 that included materially inflated numbers for the adviser's regulatory assets under management and for the Funds' gross asset values. These numbers were inflated because they were based on a valuation for the QuarterSpot position that was materially false due to Ross's falsification of the underlying loan-level performance data.

96. By engaging in the conduct described above, Defendant DLI, directly or indirectly, willfully made untrue statements of material fact in any registration application or report filed with the Commission under section 203, or 204, of the Advisers Act and willfully omitted to state in any such application or report any material fact which is required to be stated therein.

97. By engaging in the conduct described above, Defendant DLI has violated, and unless restrained and enjoined, is reasonably likely to continue to violate, Section 207 of the Advisers Act, 15 U.S.C. § 80b-7.

## PRAYER FOR RELIEF

WHEREFORE, the SEC respectfully requests that the Court:

### I.

Issue findings of fact and conclusions of law that Defendant committed the

alleged violations.

## II.

Issue judgments, in forms consistent with Rule 65(d) of the Federal Rules of Civil Procedure, preliminarily and permanently enjoining Defendant DLI, and its officers, agents, servants, employees and attorneys, and those persons in active concert or participation with any of them, who receive actual notice of the judgment by personal service or otherwise, and each of them, from violating Sections 206(1), 206(2), and 207 of the Advisers Act [15 U.S.C. §§ 15 U.S.C. § 80b-6(1), 80b-6(2), 80b-7]; Section 10(b) of the Exchange Act [15 U.S.C. §§ 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5]; and Section 17(a) of the Securities Act [15 U.S.C. §77q(a)]; and imposing a receiver over DLI and its successors, affiliate entities, and subsidiaries.

## III.

Order Defendant to disgorge all funds received from their illegal conduct, together with prejudgment interest thereon.

## IV.

Order Defendant to pay civil penalties under Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)], Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)]; and Section 209(e)(1) of the Advisers Act [15 U.S.C. § 80b-9(e)(1)].

## V.

Retain jurisdiction of this action in accordance with the principles of equity and the Federal Rules of Civil Procedure in order to implement and carry out the terms of all orders and decrees that may be entered, or to entertain any suitable application or motion for additional relief within the jurisdiction of this Court.

## VI.

Grant such other and further relief as this Court may determine to be just and necessary.

Dated: March 22, 2019

/s/ *Amy Jane Longo*
Amy Jane Longo
Lynn M. Dean
Christopher A. Nowlin
Attorneys for Plaintiff
Securities and Exchange Commission